FILED
2009 Sep-28  AM 10:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN  DIVISION

| | |
|---|---|
| **ROBIN F. GRIFFIN,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **v.** ] | **CIVIL ACTION NO.:** |
| ] | **1:06-CV-124-VEH** |
| **UNITED STATES OF AMERICA** ] | |
| **d/b/a UNITED STATES POSTAL** ] | |
| **SERVICE,** ] | |
| ] | |
| **Defendant.** ] | |

---

## MEMORANDUM OF DECISION

On January 19, 2006, Robin F. Griffin ("Griffin") filed this civil action against the United States of America ("United States") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq*. ("the FTCA"), for personal injuries arising out of an automobile accident between Griffin and Patsy R. Westbrook ("Westbrook"), a mail carrier for the United States Postal Service.  This matter is before the court following a bench trial, held on April 13, 2009, on the issues of causation and damages.  At trial, both parties presented witnesses and exhibits, as well as deposition transcripts, for the court's consideration.  After careful review of the parties' exhibits and deposition transcripts, and after careful evaluation of the trial testimony and consideration of each witness's interest, if any, in the outcome of the case, each

witness's demeanor and manner of testifying, and each witness's opportunity to acquire knowledge of the facts about which he or she testified, as well as the extent to which other credible evidence either supported or contradicted each witness's testimony, the court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). Based on these finding of fact and conclusions of law, the court will enter judgment for Griffin.

## I. JURISDICTION AND VENUE

The court exercises jurisdiction over this action pursuant to 28 U.S.C. § 1346(b)(1) (United States as defendant in personal injury action alleging negligence). The parties do not contest personal jurisdiction or venue, and the court finds evidence sufficient to establish both.

**A.     Parties and Procedural Background**

Griffin is a citizen and resident of Arkansas.

Defendant is the government of the United States of America.

The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1346(b)(1).

Venue in this district is proper pursuant to 28 U.S.C. § 1391(e)(2) in that the events or omissions giving rise to the claim occurred in the Northern District of Alabama.

Griffin timely filed her Administrative Claim against Defendant and, through

amendments, asserted a claim in the amount of $2,500,000.00 for personal injury and property damage as required by 28 U.S.C. §2675(a).  (*See* Court Docs. 29, 30, 37, and 38).

The United States Postal Service effectively denied Griffin's claim by failing to make a final disposition of it within six months after it was filed.  *See* 28 U.S.C. §2675(a).  ("The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.").

On January 19, 2006, Griffin filed a complaint against the United States pursuant to the FTCA.  Griffin's complaint contained two counts: one for negligence (Count I) and one for wantonness (Count II)[1].  Both claims sought damages in excess of $75,000.00 for personal injuries arising out of an automobile accident between Griffin and Westbrook.  The damages claimed in the Complaint were: injuries to Griffin's legs, left arm, left foot, forehead and back; excruciating physical pain and suffering; severe mental anguish and stress; temporary total disability and permanent partial disability; medical expenses; future medical expenses; lost wages; and decreased earning capacity.  (Complaint, Count I, ¶ 4; Count II, ¶ 4).

---

[1]  At trial, counsel for Griffin stated that Griffin was only asserting a claim of negligence and not of wantonness.

On March 27, 2006, the United States filed an answer in which the United States denied the material allegations of the complaint, other than "that on July 25, 2003, USPS employee Patsy Westbrook was involved in a minor collision with Robin Griffin ... [,that Griffin] is entitled to assert this Court's jurisdiction pursuant to the Federal Tort Claims Act" and that "USPS employee Westbrook was acting in the course of her federal employment at the time [of the minor collision]." (Answer, Count I, ¶¶ 2, 3, 7; Count II, ¶¶ 2, 3, 7). The United States also asserted seven affirmative defenses. Contributory negligence was not asserted as an affirmative defense.

On August 1, 2008, the United States filed a Motion for Judgment as a Matter of Law on the issue of whether Griffin had properly presented her required administrative claim. On November 7, 2008, the Court found that Griffin had properly filed the required claim but that the amount of damages she had properly claimed was limited to $500,000.00. On Griffin's motion, on December 4, 2008, the Court altered and vacated this partial judgment and the case was allowed to go to trial on Griffin's claim as amended (seeking $2,500,000.00). (*See* Court Docs. 29, 30, 37, and 38).

## II.  ISSUES PRESENTED FOR DECISION

At trial, the United States stipulated that Griffin had established that Westbrook

was negligent while acting in the scope of her employment and that such negligence proximately caused the accident.  Further, the United States stipulated that Griffin was not contributorily negligent.  Finally, the United States stipulated that Griffin was personally injured in that she suffered cuts to her left arm.  The parties agreed that the only issue for the Court to decide was whether Griffin had established, by a preponderance of the evidence, that her failed back syndrome was proximately caused by the accident.  Of course, if the Court found such causation had been established, the Court would also have to determine the amount of Griffin's recoverable damages.

### III.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.  <u>The Accident</u>

On July 25, 2003, Westbrook's vehicle and Griffin's vehicle were traveling toward each other on Harold Boozer Road in Calhoun County, Alabama, within the Northern District of Alabama.  Westbrook was delivering mail for her employer, the United States Postal Service.  Westbrook was therefore driving "postal style" in that she was sitting in the front passenger sear, with the seat adjusted as far forward as she could move it.  She was steering with her left hand only and using her left foot to operate the gas and brake pedals.  Westbrook is short and she had to stretch her left arm to reach the steering wheel and her left leg to reach the gas and brake pedals.

Westbrook looked down and noticed that there was a grasshopper on her chest.

She is afraid of grasshoppers.  She took both hands and tried to brush the grasshopper off her.  She completely let go of the steering wheel.  Her vehicle entered Griffin's lane of travel.  When Westbrook demonstrated to the court her actions upon realizing that the grasshopper was on her, the court noted that Westbrook not only took her left hand off the steering wheel, but she also pulled her left leg over toward her body (and thus away from the gas and brake pedals).

Griffin saw Westbrook's vehicle headed toward her in Griffin's lane of travel.  Griffin immediately steered her vehicle as far to the right as she could without putting the car in a ditch adjacent to the road.  Griffin steered her car so far to the right that the right wheels were on the grass beside the road.  Griffin also tried to slow her car down.

When Westbrook looked up (after brushing the grasshopper off), she saw Griffin's vehicle and tried to steer the car back into her own lane.  There was no testimony that Westbrook tried to slow her vehicle down.

[The vehicles collided head-on in that the cars were traveling in opposite directions – that is, each car was heading toward the other.]  Only the side mirrors impacted.  The glass in the side mirrors broke.  Griffin's driver side front window was down at the time of collision.  Griffin jerked her body to the right to try to avoid having the flying glass hit her.  She felt a twinge down her right leg but didn't think

6

anything of it.  Her left arm was cut by the glass.

A police officer came to the scene of the accident and took a report.  Neither Griffin nor Westbrook requested medical treatment.

Westbrook only saw Griffin for a second or two before the impact.

The speed limit at the place of the accident is 25 miles per hour.

Westbrook saw Griffin's long blonde hair blowing out the driver's window and that caused her to think Griffin was speeding.

Westbrook thought Griffin was going about 35 miles per hour when she saw her before the collision.

Griffin told Westbrook that she was in a hurry to pick up her [Griffin's] son.

Griffin did not go to the emergency room or seek medical attention on the day of the accident.  She did not seek medical attention until the "third day," when she started having "really bad trouble."  Because she had previously had back surgery, she called her treating physician, Dr. James G. White, III ("Dr. White").  She was not able to obtain an appointment with Dr. White until August 13, 2003.  She kept that appointment and was seen by Dr. White.

B.    Griffin's Pre-Accident Medical History and Treatment

Griffin has a history of back pain since December, 1993.

In December, 1993, Dr. White began treating Griffin for low back pain.

In January, 1994, Griffin was diagnosed as having a probable herniated disc at L5 that did not appear to touch either nerve root.

In February, 1995, Griffin complained of low back pain after she fell down some steps.

In August, 1998, Griffin developed, without new injury, severe pain in her low back, left buttocks, and left leg.

In October, 2001, after lifting her (then) five-year-old son, Griffin reported to her doctor that she had developed excruciating pain in her lower back and down both legs.

In November, 2001, Griffin had a lumbar laminectomy at L5 (right side). This was the first of three back surgeries that Griffin has had.

In January, 2002, Dr. White said that Griffin had reached maximum medical improvement and allowed her to return to work.

In August, 2002, Griffin reported to her doctor that she had developed excruciating pain in her left leg (left anterior thigh and into her left leg) after swimming. Dr. White diagnosed Griffin as having a collapsed disc at L5.

In September, 2002, Griffin had a decompressive total lumbar laminectomy at the L5 level with diskectomy and surgical fusion. This was her second back surgery.

In November, 2002, Griffin had to perform extended heavy lifting at work.

Griffin reported low back pain to Dr. White.

In December, 2002, Griffin told Dr. White that one of the physical therapy exercises hurt her.  She told him that she took pain medication and muscle relaxers before physical therapy.  He told her not to do that anymore and she agreed to stop.

In January, 2003, Dr. White found that Griffin had reached maximum medical improvement and released her to return to work without restrictions.

C.    Griffin's Post-Accident Medical History and Treatment

Three days after the July 25, 2003, collision, Griffin thought her back pain was "real bad."  However, the first appointment she could get with her back surgeon, Dr. White, was not until August 13, 2003.

Griffin saw Dr. Carter for pain after the accident and prior to her August 13, 2003, appointment with Dr. White.  The last time she saw Dr. White was September 17, 2003.

Dr. Carter prescribed pain pills and muscle relaxers, which Griffin took.  Griffin also had an epidural; however, her pain continued.  She had more epidurals but the pain continued.  As of her November 11, 2003, appointment with Dr. Carter, she rated her pain a "2" out of "10".

Dr. Carter referred Griffin to Dr. Faulkner.

Dr. Faulkner saw Griffin on January 9, 2004.  Her chief complaint was "low

back pain and right leg pain since July 25, 2003, after a [minor] car accident." She told Dr. Faulkner that "she had to jerk back to avoid getting glass in her face." She told Dr. Faulkner "that she has had some problems since that time" (the July 25, 2003, accident). She told Dr. Faulkner that "the pain is worse on resting and after she has been at work. She says that she is OK when she is at work and is active." Dr. Faulkner reviewed her lumbar spine x-rays and "[did] not see any signs of loosening of the screws or a non-union of her fusion." Dr. Faulkner referred Griffin back to Dr. Carter.

However, Griffin did not go see Dr. Carter from January until July, 2004, because she "was having trouble with money."

By July 9, 2004, when Griffin saw Dr. Carter again, her pain had gotten worse. She had not had any incidents at work or any other injuries since the July 25, 2003, accident. Griffin told Dr. Carter she did not want to have more surgery. However, she had had three epidurals (since the accident) and only the first one had given her any relief. Dr. Carter referred her to Dr. Kraus to see if she might be a candidate for non-surgical, pain management measures.

On August 25, 2004, she saw Dr. Faulkner. He set her up for an epidural block.

In September, 2004, Griffin was hospitalized for 72 hours with a "constant

drip" of pain medication.  She still had pain and was told she had to have back surgery for the third time.

Nothing happened between the day of the collision and the day of the third surgery to injure her back.  She was not in pain after she finished her post-second surgery physical therapy and was released back to work in January, 2003.

Prior to the July 25, 2003, collision, she did not need epidurals or pain medications.  Prior to the July 25, 2003, collision, she worked full time.

On October 22, 2004, Dr. Faulkner took her off work.  She has not been able to return to work since that date.

On November 2, 2004, Griffin had her third back surgery.  Dr. Faulkner removed the "hardware" from her second back surgery because there had been a bilateral fibrous nonunion L5-S1 with loose segmental instrumentation.  Dr. Faulkner took out the previous hardware, decorticated the posterior fusions bed, aspirated bone marrow from the iliac crest bone, and implanted canellous bank bone, Grafton Flex, and bone marrow aspirate.

However, removing the hardware and refusing her spine did not give Griffin any pain relief.  On December 15, 2004, Griffin told Dr. Kraus that her pain was from 7 to 8 out of 10 with a maximum being 10 out of 10.

At the time of the July 25, 2003, collision, Griffin weighed a lot less than she

did at the time of the trial. She was put on steroids as part of her post-accident pain management. Griffin became inactive after the third surgery and attributes her weight gain to steroids plus inactivity due to pain. She gained so much weight that her weight reached 320 pounds. At the time of the trial, her weight was down to 250 pounds, but still was a lot more that her pre-accident weight.

She does not take pain medications because she cannot afford them and Medicare will not pay for them.

She is totally changed from the way she was before the third surgery. Due to the excruciating pain, she can no longer mow the grass, although she tries to. She can no longer move small tree limbs in her yard. She can no longer do the things she wants to do with her son. She can no longer walk the long aisles at WalMart. She is very depressed. Previously, she was a happy person. She cannot work anymore even though she loved her job. Sometimes, she won't even answer the door. She drove down from Arkansas for trial. She is more comfortable if she drives than if she is a passenger. She took the back seat out of her car for the drive down to Birmingham for trial so that she could lie down in the back when the pain gets too bad.

Griffin is not a malingerer. If anything, she tends to downplay her pain. Griffin loved her job and, prior to the July 25, 2003, accident, she asked her doctors

to clear her to return to work.

On September 22, 2005, the Social Security Administration determined that Griffin qualified as totally disabled, with an onset date of October 22, 2004, and that Griffin was eligible to receive social security disability benefits because of her disability. Griffin has received social security benefits continuously since September 22, 2005. However, no evidence was introduced as to the amount of such benefits.

The parties stipulated at trial that Griffin has failed back syndrome and that nothing more can be done for her other than pain management.

At trial, the United States conceded that after July 25, 2003, Griffin had incurred $90,527 in medical bills related to her failed back syndrome.

D.     Expert Medical Testimony Presented at Trial[2,3]

The entire depositions of three physicians were received, by stipulation, at trial. At the court's request, the parties filed, post-trial, specific pages of depositions that they relied upon. (*See* Doc. 51, Griffin's designations of pages of the depositions of

---

[2] No challenge was raised to the qualifications of any of the physicians to testify as to the opinions asserted. Further, the court independently finds that all three physicians were so qualified.

[3] The vast majority of the opinion questions asked and answered during the depositions of the three doctors were not stated in terms of a "reasonable degree of medical certainty." However, at all three depositions, the parties stipulated that the only objections which had to be made at deposition were objections to form or leading questions. Neither party objected during any deposition to the form of any opinion questions. Finally, neither party objected at trial to any portion of any deposition. Thus, the court finds that the parties have mutually waived any failure by any doctor to state that an opinion he held was to a reasonable degree of medical certainty.

Drs. White and Faulkner; Doc. 52, the United States' designations of pages of the depositions of Drs. White, Faulkner, and Sorrell.)[4]  However, the court has read all the pages of the depositions of all three doctors.

Drs. White and Faulkner are Griffin's former treating physicians.  Dr. Sorrell was retained by the United States as an expert[5] and, during Dr. Sorrell's deposition, Griffin's counsel stipulated that Dr. Sorrell "is an orthopaedic surgeon and he is competent to testify as an expert in the field of orthopaedic surgery and that he's board certified in the State of Alabama."

1.    <u>Testimony of Treating Physician, Dr. James White</u>

Dr. White testified that the problems that he treated Griffin for were consistent with the history that she gave him of the accident.  "Yes, ... [Griffin] never complained of anything after her [second] surgery, never heard from her, and I'm assuming her history [description of the collision] would be correct.  I mean, clearly

---

[4]  The United States stated in its filing that the specified deposition pages of all three doctors were submitted "in support of its argument that [Griffin's] injuries were not proximately caused by the subject accident."  Griffin did not specify for what purpose she was submitting her selected deposition pages.  However, since the United States stipulated that all of Griffin's post-July 25, 2003, medical expenses were incurred and were reasonable, but contested that they were related, that is, argued that they were not incurred as a proximate result of the July 25, 2003, accident, the court assumes that Griffin's pages were offered in support of her argument that Griffin's post-July 25, 2003, injuries <u>were</u> proximately caused by that accident. Further, during closing argument, when Griffin's counsel discussed the testimony of the doctors, he clearly was referring to the testimony as supporting Griffin's position regarding proximate cause.

[5]  Dr. Sorrell reviewed copies of Griffin's medical records and copies of the depositions of Drs. White and Faulkner.  He also physically examined Griffin.

this [is] a force efficient kind of injury.  I just didn't see anything surgical, but obviously, you can have injury to a nerve without having a surgical condition." Further, based on his examinations of Griffin on August 13, August 27, and September 17, 2003, the injuries that he saw were consistent with the history [description of the collision] Griffin gave to him.  "Yes, obviously there was sufficient force to cause that sort of complaint."

Dr. White further testified "to a reasonable degree of medical certainty," that Griffin's injuries that existed on August 13, August 27, and September 17, 2003, were because of the accident.

Dr. White further testified that Griffin complained of hurting severely after the July 25, 2003, accident.

Dr. White further testified that, before the accident, Griffin survived eight years with a herniated disc, working during that entire time, including after the first two surgeries, and that she always wanted to go back to work.

Dr. White further testified that, before the July 25, 2003, accident, Griffin would come see him if she had a bad flare-up and it would resolve itself very quickly and he would release her to go back to work.

2.   Testimony of Treating Physician, Dr. J. Stanford Faulkner, Jr.

Dr. Faulkner testified that, during the third and final surgery (that is, the

15

November 2, 2004, surgery), he found that Griffin had fibrous nonunion of her fusion; the hardware was loose and she had some scar tissue and narrowing around the nerve canal.

Dr. Faulkner further testified that the July 25, 2003, collision would not have "cause[d] the fusion not to occur."

Dr. Faulkner further testified that Griffin was doing "pretty good" until the July 25, 2003, accident and "then she started having pain after that."  "She even tried to play down the wreck when she described it.  And often you'll find that an incident can cause aggravation of a pre-existing problem, which I think this was."  In his opinion, the July 25, 2003, accident caused Griffin's pain and, but for Griffin's pain, he would not have performed the November 2, 2004, back surgery.  However, he could not find any objective findings that related to the July 25, 2003, accident.

Dr. Faulkner further testified that it is more likely than not that Griffin would have had to have the third surgery at some point, but then he later testified that he did not know how long Griffin could have "gone" without the third surgery if she hadn't had the July 25, 2003, accident, that it could have been years, and that Griffin "may not even have [ever] needed to have it."

Dr. Faulkner further testified that standing at work on a production line and performing at a minimum medium category work "could" cause low back pain that

then causes radiating symptoms into legs and numbness.  However, he was not asked

and did not testify that such activities would have caused a patient with the conditions

that he learned, as a result of the third surgery he performed, that Griffin had, to have

pain that was so bad that the patient would need surgery.

    3.    <u>Testimony of Defendant's Retained Expert, Dr. Robert Sorrell</u>

Dr. Sorrell was asked, by counsel for the United States, "Based on your review

of the records and the depositions [of Drs. White and Faulkner] and your visit with

Ms. Griffin can you state to a reasonable degree of medical certainty whether her

treatment leading up to her surgery in November of 2004 was caused by the [July 25,

2003] accident?"  He answered

> It's – I'm going to answer the question in a little bit of a roundabout
> way.  It's a very difficult – that's a very – it's a very difficult case and
> a very difficult question to answer.  You know, it involves going four
> years back in time.  There was a three week window between when the
> accident happened and when she – as you said, when she did go get
> help.  You know, she's had – she's had back problems, you know,
> dating ten years prior to this accident – going back ten years prior to this
> accident.  I don't think the accident caused the problems after the –
> caused the problems that Dr. Faulkner was treating.  I think worst case
> scenario is the accident aggravated a pre-existent problem and so in that
> way it may have been somewhat causally related.  But I think cause is
> a little strong term.  Does that answer the question?

On follow-up, still by counsel for the United States, Dr. Sorrell elaborated that

Dr. Faulkner's "findings in the surgery, the nonunion, the loosening of the hardware,

and the scar tissue" "was – I mean, you know, one of the leading reasons for me to come to the assumption that it mostly was an aggravation of a pre-existing injury."

Dr. Sorrell further testified that nonunion can cause pain, loosened hardware can cause pain, and scar tissue that encroaches on the nerve roots can cause pain.

Dr. Sorrell further testified that Griffin's symptoms following the accident would "very, very possibl[y]" have been consistent with the type of symptoms that he would expect from a nonunion and loosening of hardware and scar tissue.

Dr. Sorrell further testified that Griffin "definitely" had failed back syndrome, which he defined as someone who has had multiple surgeries for back problems but who is still hurting "real badly" and "there's no other surgical treatment you can do for them."

When asked "at what point in [Griffin's] treatment she could be characterized as having a failed back?", Dr. Sorrell testified that, although "ten [different] doctors ... might give ... a little different time," he thinks it was after she had "had the nonunion explored and fixed and then a year later she's essentially worse than she was before then that's about when I would do it which would, you know, make that late 2005, 2006."

Dr. Sorrell further testified that the findings that Dr. Faulkner made during the third surgery would "very likely" have led to Griffin "experiencing pain at some

point," "regardless of whether she had been involved in an accident in the meantime." However, he also testified that "nobody would know" how long Griffin could have gone without needing the third surgery.

Dr. Sorrell further testified that, in his opinion, Griffin more likely than not would not have been able to continue working regardless of whether [the July 25, 2003,] accident occurred.  However, he also testified that "until she started having the pain [after the July 25, 2003, accident] she was able to work" and "it's the pain that prevent[ed] her from working."

Dr. Sorrell further testified that Griffin's jerking to the right at the time of the collision could cause a problem with the nonunion but he thought it would be unlikely "[j]ust because [he didn't] think there was enough force and trauma there.'"

D.    **Damages**[6]

1.    Medical Expenses

Griffin claims damages for medical expenses (past and future), lost wages (past and future), past and future pain and suffering, including mental anguish, and significant permanent impairment.

---

[6] Alabama law governs the standard for damages here. *See Harden v. United States,* 688 F.2d 1025, 1029 (11th Cir.1982) (stating that "the components and measure of damages in FTCA claims are taken from the law of the state where the tort occurred") (internal quotation marks and citation omitted).

Under Alabama law, a plaintiff may recover reasonable and necessary medical expense incurred as a result of injury. *See Stone v. Echols*, 351 So.2d 902, 903 (Ala.1977); Jenelle Mims Marsh & Charles W. Gamble, Alabama Law of Damages § 36:3 (5th ed.2004). The defendant may present evidence that a collateral source paid for the plaintiff's medical expenses. Ala. Code § 6-5-545.

At trial, the parties stipulated that Griffin has incurred $90,527.98 in medical bills, that the bills were reasonable and necessary, and that Blue Cross Blue Shield has asserted subrogation liens in the amount of $36,277.09.

Griffin testified that one of her medications for pain is not paid for by Medicare and costs $167 for a month's supply.

2.    Lost Wages

At the time of the accident, Griffin was thirty-five years old and employed as a quilter at Springs Industries making $22,000 to $23,000 per year.

3.    Pain and suffering, including mental anguish, and physical impairment

Griffin introduced substantial evidence that her life has been totally changed by her failed back syndrome. She cannot work or interact in a normal way with her child. She cannot mow the lawn. She cannot "move [small] limbs" without hurting so much that she has to lie down. She has to lie down all day long. Work and her child were her two main pleasures in life. She has become depressed. She has to take

20

steroids and has gained a great deal of weight.  However, she cannot afford to take certain pain medications which, presumably, would help with her pain and allow her to resume a more normal lifestyle.

In view of all the evidence, the court finds that Griffin's total damages are $750,000.00, which includes compensation for pain and suffering (including mental anguish), permanent impairment, reasonable and necessary medical expenses (past and future), and lost wages.

## B.    CONCLUSIONS OF LAW

In its answer, the United States denied that its agent was negligent.[7]  However,

---

[7]  There was a reference during discussion between the court and counsel for the United States to Griffin's having been contributorily negligent.  However, the court has reviewed the Answer.  Contributory negligence was not pled.  Contributory negligence is an affirmative defense that must be "affirmatively state[d]."  Rule 8(c)(1), Fed.R.Civ.Pro.  Moreover, this defense was not tried by express or implied consent of the parties, such that it was before the court pursuant to Rule 15(b), Fed.R.Civ.Pro.  *See Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1487 (11th Cir. 1987) ("A party cannot be said to have implicitly consented to the trial of an issue not presented by the pleadings unless that party should have recognized that the issue had entered the case at trial.... Often such consent can be inferred from the failure to object to the introduction of evidence relevant to an unpleaded issue . . . The introduction of evidence arguably relevant to pleaded issues cannot serve to give a party fair notice that new issues are entering the case.) (emphasis supplied).  Finally, even if the defense was tried by implied consent, the court finds that there was no credible evidence of any negligence by Griffin.  Westbrook's testimony was that she looked down and saw that she had a grasshopper on her chest, took both hands off the wheel (to brush the grasshopper off), swerved into Griffin's lane, and when she looked up she immediately attempted to get her vehicle back into her lane and avoid the collision, but she was unable to avoid the collision.  Westbrook never testified that she tried to slow down and, when she demonstrated her reaction to the grasshopper for the court, she pulled her left foot (that had been controlling the gas and brake pedals) over to the passenger side of the car (where her right foot and indeed her entire body, once she pulled her left hand and foot to the passenger side) was also located.  Westbrook also testified that Griffin was traveling 35 miles per hour and the speed limit was 25 miles per hour because it was a rural

when questioned by the court at the close of trial, counsel for the United States stated that the United States was conceding that Westbrook was negligent and further stated that the <u>only</u> issue for the court to decide is to what extent Griffin's injuries were proximately caused by the automobile accident.  In other words, the United States conceded that Westbrook was acting within the scope of her employment, that her negligence caused the car accident, and that Griffin was personally injured at least in that she was cut by flying glass.[8]

The governing law in actions against the United States under the Federal Tort Claims Act is that "of the place where the act or omission occurred".  *United States v. Muniz*, 374 U.S. 150 at 153, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963).  Whether negligence is a proximate cause of the injury sued for as well as the legal standards governing causation is controlled by the law of the state in which the accident

---

road, and that Griffin was going fast because her hair was "blowing out the window."  Also, Westbrook testified that, after the accident, Griffin said she was in a hurry to pick up her [Griffin's] son.  Westbrook admitted that the point of impact of the two cars occurred in Griffin's lane.  Due to Westbrook's testimony about the limited time she had to observe Griffin prior to the impact and her reliance upon Griffin's blowing hair as to sole basis for her opinion as to Griffin's speed, the court accords <u>no</u> weight to Westbrook's testimony as to Griffin's speed. Further, there was <u>no</u> testimony or other evidence that, had Griffin been traveling slower, the accident would not have occurred.  In fact, Griffin's undisputed testimony was that, as soon as she saw Westbrook's vehicle enter her lane of travel, Griffin pulled the car as far to the right as she could without putting it in a ditch and tried to slow down.  Thus, even if the United States had timely pled contributory negligence, the court finds that the United States failed to show that Griffin was contributorily negligent and, indeed, the evidence at trial established beyond contravention that she was <u>not</u> contributorily negligent.

[8]  Griffin has not asserted a claim for property damage to her car.

occurred. 28 U.S.C. s 1346(b); *Parada v. United States*, 420 F.2d 493 (5th Cir. 1970)[9]. The accident in this case occurred in Alabama. The court therefore applies Alabama law.

Additionally, the parties stipulated that Alabama law controls all issues relating to Griffin's recoverable damages, to negligence, and to proximate causation.

1.   <u>Griffin's Injuries Were Proximately Caused by the Accident</u>

"The proximate cause of a negligent injury is established where an injury is the natural and probable consequence of the negligent act or omission (or a direct wrongful act) which an ordinary prudent person ought reasonably to foresee would result in injury. *Vines v. Plantation Motor Lodge*, 336 So.2d 1338 (Ala., 1976)." *Peevy v. Alabama Power Co.*, 393 So.2d 971, 973 (Ala., 1981). Westbrook's actions in looking down while driving her vehicle, taking her only hand that was on the steering wheel off it, moving her only foot that was near the gas and brake pedals away from the pedals, and thereafter swerving into Griffin's lane of travel, proximately caused the accident. In addition, the United States has conceded that Westbrook was negligent and that her negligence caused the accident.

In order to receive any damages, Griffin has the burden to show that such

---

[9]   *See, Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit).

damages flowed directly and naturally from the accident. *Southern Ry. Co. v. Coleman,* 44 So. 837, 838 (Ala. 1907). The defendant, however, takes the plaintiff as he finds him, and thus is liable for any proximately caused aggravation of a preexisting condition. That is because, "[w]hen an actor's tortious conduct causes harm to a person that, because of the person's preexisting physical or mental condition or other characteristic, is of a greater magnitude or different type than might reasonably be expected, the actor is nevertheless subject to liability for all such harm to the person." "Every United States jurisdiction adheres to the thin-skull rule; more precisely, extensive research has failed to identify a single United States case disavowing the rule." *Id*. at comment b. That is, as long as the <u>type</u> of harm suffered is within the scope of the foreseeable risk, the <u>extent</u> of the harm need not be foreseeable. *Cf. Hammerstein v. Jean Dev. West*, 907 P.2d 975, 978 (Nev.1995). *See Maurer v. United States*, 668 F.2d 98, 100 (2d Cir.1981) (applying federal law) ("when a plaintiff has a preexisting condition that would inevitably worsen, a defendant causing subsequent injury is entitled to have the plaintiff's damages discounted to reflect the proportion of damages that would have been suffered even in the absence of the subsequent injury, but the burden of proof in such cases is upon the defendant to prove the extent of the damages that the preexisting condition would inevitably have caused"). REST 3d TORTS-PH § 31.

It is beyond dispute to say that personal injury is a type of harm that is within the scope of foreseeable risk of negligent operation of an automobile.  *See*, *Looney v. Davis*, 721 So.2d 152, 162 (Ala. 1998) ("[G]enerally a defendant may be found liable if some physical injury of the general type the plaintiff sustained was a foreseeable consequence of the defendant's negligent conduct, even though the extent of the physical injuries may have been quite unforeseeable. Indeed, it has been noted, 'There is almost universal agreement upon liability beyond the risk, for quite unforeseeable consequences, when they follow an impact upon the person of the plaintiff.' W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 43, at 291 (5th ed.1984) (footnote omitted). *See also* 65 C.J.S. Negligence § 109 (1966)."

Although it is undisputed that Griffin had back problems before the July 25, 2003, accident, she has proven by a preponderance of the evidence that the force trauma of the July 25, 2003, accident proximately caused her to have the pain that necessitated her third back surgery, that she has failed back syndrome, that she is in continuous debilitating pain despite such third surgery, and that there is no other treatment option for her other than pain management.

Specifically, the testimony of all three doctors establishes that the July 25, 2003 accident caused Griffin's failed back syndrome.  Dr. White was Griffin's treating physician.  His testimony that Griffin's post-accident complaints were caused by the

force trauma of the accident was unequivocal.  This testimony was disputed by Dr. Sorrell's testimony, but Dr. Sorrell's testimony in contrast to Dr. White's  - and Dr. Faulkner's - was at best equivocal.  For example, Dr. Sorrell testified that Griffin's jerking to the right at the time of the collision could cause a problem with the nonunion but he thought it would be unlikely "[j]ust because [he didn't] think there was enough force and trauma there.'"

Dr. Faulkner was also Griffins treating physician.   His testimony was unequivocal that, in his opinion, the July 25, 2003, accident caused Griffin's pain and, but for Griffin's pain, he would not have performed the November 2, 2004, back surgery.  While he testified at one point that it is more likely than not that Griffin would have had to have the third surgery at some point, he later testified that he did not know how long Griffin could have "gone" without the third surgery if she hadn't had the July 25, 2003, accident, that it could have been years, and that Griffin "may not even have [ever] needed to have it."

Dr. Sorrell was the United States' retained expert.  Viewed from the position of the United States' burden to show the extent of the damages that Griffin's undisputedly pre-existing back problem would have caused her if the July 25, 2003, accident had not occurred, his testimony as to causation was equivocal at best and at worst it agreed with Dr. Faulkner that the July 25, 2003, accident aggravated Griffin's

pre-existing back problems.  In fact he testified "I don't think the accident caused the problems after the – caused the problems that Dr. Faulkner was treating.  I think worst case scenario is the accident aggravated a pre-existent problem and so in that way it may have been somewhat casually related."  Dr. Sorrell elaborated that Dr. Faulkner's "findings in the surgery, the nonunion, the loosening of the hardware, and the scar tissue" "was – I mean, you know, one of the leading reasons for me to come to the assumption that it mostly was an aggravation of a pre-existing injury."  Dr. Sorrell further testified that the findings that Dr. Faulkner made during the third surgery would "very likely" have led to Griffin "experiencing pain at some point," "regardless of whether she had been involved in an accident in the meantime."  However, he also testified that "nobody would know" how long Griffin could have gone without needing the third surgery.  Dr. Sorrell further testified that, in his opinion, Griffin more likely than not would not have been able to continue working regardless of whether [the July 25, 2003,] accident occurred.  However, he also testified that "until she started having the pain [after the July 25, 2003, accident] she was able to work" and "it's the pain that prevent[ed] her from working."  Dr. Sorrell further testified that Griffin's jerking to the right at the time of the collision could cause a problem with the nonunion but he thought it would be unlikely "[j]ust because [he didn't] think there was enough force and trauma there.'"

27

Further, the United States has failed to show that any intervening event caused Griffin to develop failed back syndrome.

Still further, the United States has failed to show that Griffin would inevitably have developed failed back syndrome even if the July 25, 2003, accident had not occurred.

Although Dr. Faulkner testified that standing at work on a production line and performing at a minimum medium category work "could" cause low back pain that then causes radiating symptoms into legs and numbness, he was not asked and did not testify that such activities would have caused a patient with the conditions that he learned, as a result of the third surgery he performed, that Griffin had, to have pain that was so bad that she needed surgery.

Therefore, the court concludes that the negligence of Westbrook proximately caused Griffin's failed back syndrome and the United States therefore is liable to her for all of her damages set out above.

## III.  CONCLUSION

Based on the foregoing, the court finds in favor of Plaintiff Robin Griffin and against Defendant United States.  A judgment order consistent with this opinion will be entered.

**DONE** this the 28th day of September, 2009.

**VIRGINIA EMERSON HOPKINS**
United States District Judge